RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0198p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

RANDALL MCELHANEY,

              *Plaintiff-Appellant*,

    *v*.

DUSTIN WILLIAMS; WILLIAM STEPP; NATHAN BROWN;
TIMOTHY MARTIN; JOHN PETTIT; PUTNAM COUNTY,
TENNESSEE SCHOOL SYSTEM,

              *Defendants-Appellees*.

> No. 22-5903

───────────────

Appeal from the United States District Court for the Middle District of Tennessee at Cookeville.
No. 2:21-cv-00019—Waverly D. Crenshaw, Jr., Chief District Judge.

Argued: May 1, 2023

Decided and Filed: August 25, 2023

Before: GILMAN, READLER, and MATHIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Perry A. Craft, LAW OFFICE OF PERRY A. CRAFT, PLLC, Nashville, Tennessee, for Appellant. Daniel H. Rader IV, MOORE RADER FITZPATRICK & YORK, P.C., Cookeville, Tennessee, for Appellees. **ON BRIEF:** Perry A. Craft, LAW OFFICE OF PERRY A. CRAFT, PLLC, Nashville, Tennessee, for Appellant. Daniel H. Rader IV, Daneil H. Rader III, MOORE RADER FITZPATRICK & YORK, P.C., Cookeville, Tennessee, for Appellees.

————————————

**OPINION**

————————————

CHAD A. READLER, Circuit Judge.   Youth sports are as much about instilling life lessons as they are winning and losing.  Child athletes can be forgiven for occasionally losing sight of this bigger picture.  But we expect more from their parents.

As this case demonstrates, those expectations are not always met.  Randall McElhaney is an enthusiastic supporter of his daughter, who, when this dispute arose, was an infielder on her high school softball team.  His passion, however, sometimes gets the best of him.  When his daughter was benched, McElhaney sent text messages to her coach criticizing his managerial decisions.  In response, school officials banned McElhaney from attending games for the next week.

A dispute over the team's starting infield soon became much more.  McElhaney filed this suit, alleging that school officials retaliated against him for criticizing his daughter's coach, speech that McElhaney believed was shielded by the First Amendment.  Defendants moved for summary judgment on qualified immunity grounds.  In their minds, McElhaney was not denied a constitutional right, let alone one that was clearly established.  Reaching only the clearly established prong of qualified immunity, the district court granted defendants' motion and entered judgment in their favor.

As we see things, it is clearly established at a low level of generality that when a school employee interacts with a student, speech by the student's parent about those interactions enjoys First Amendment protection.  On that basis, we must reverse the district court.  We remand the case to resolve whether retaliation occurred in the first instance.

I.

Randall McElhaney is the father of L.M., who played softball for the Upperman High School team during her senior year. McElhaney was a dedicated booster of both his daughter and her team. For the season at issue, McElhaney was a season ticketholder, having purchased seats behind home plate, where a sign identified McElhaney as the ticket owner.

At the softball season's inception, the school distributed to team members and their families a "Parent – player Information" sheet. Primarily, the form addressed expectations for student conduct. For example, the form explained that a player may be suspended if she does not show up in uniform for a game or maintain the requisite grade point average. The sheet also included instructions to parents. Parents were encouraged to be "supportive" of the players and to refrain from "negativity." And they were prohibited from attending team practices or interacting with their child mid-game.

The instruction sheet set guidelines for discussing playing time with the coaches. When it came to the student athletes, coaches had an "open door" policy. But the same was not true for parents: "Playing time is a non negotiable for coaches to talk directly with parents about."

During her senior year, L.M. played second base and pitched for the Upperman team. As the season progressed, L.M.'s playing time decreased. McElhaney was not pleased with this development. While sitting with his daughter at home, McElhaney texted Upperman Coach Dustin Williams to express his displeasure:

> You need to look at the books and find out which kid has made the least amount of errors on the team. I can tell you [L] is with 0. You benched [L] out of 2nd base after I rebutted what Mike told you that [L] needed to under hand that ball to [A] at 1st in the Soddy Daisy Tournament and I said [L] had to throw it fast like that to get the girl out because if she wouldn't have the girl would have been safe. [C] has made two errors already at 2nd base and you had to get onto her during the Dekalb County game and she does not cover bases at all. She has no idea what she is doing. She got played over every one of her middle school years at 2nd. So you are benching an upper classman to put her there. That is not understandable at all. Your other 2 pitchers don't leave the field at all. I didn't understand when you took [L] out of the pitching circle why she didn't just trade places with [A] at 2nd the other night in Livingston. . . .

[L] is right here and said she doesn't disagree with any of what wa[s] just said. I told her this is what she should have said to you in the teachers lounge when she talked to you today.

Williams responded, conveying the view that McElhaney either reconsider his tactics or reconsider his participation in team events:

I am sorry you feel this way, and sorry that you don't understand that we are only trying to do what we feel like is best for our team currently. I don't feel like running down other players is the best way to approach the situation nor do I feel like questioning our programs structural integrity is beneficial for anyone involved. We enjoy having [L] on our team and appreciate her heart . . . she is a great kid and a joy to be around, but I am under no circumstances going to continue to justify our reasons for what we do inside of our program or what we feel like is best for us. It seems from the comments I have heard that have came from you outside the park that you are extremely displeased with how we are running the program and have an exponential amount of opinions on how we should be running it . . . crazy we have to have that conversation at 6-0 in the district but everyone is entitled to their own opinion. It seems we have reached the boiling point and you have a couple of options. . . 1.) go talk to my administration about how you feel 2.) walk away from the program or 3.) allow us to continue working daily to do what we feel like is best for our program and support us instead of running us down. I will not have this conversation again and feel completely disrespected in how this is being handled.

McElhaney texted a somewhat conciliatory reply:

If you feel so disrespected, I would love for you to tell me how this . . . situation should be handled any differently than discussing it with you instead of running to someone else . . . . I have coached several teams in my past so its not like I don't know what I'm talking about . . . . I will never go to administration over a coach unless they physically harm my kid. I don't believe in that. If I ever feel I need for my kid or kids to step away from a team I will pull them. Then we will have a decision to either not . . . play at all or have them transfer and play for someone else. My kids are no where near allstars and I don't treat them that way at all. I would like . . . for her to remain with the team but would also like to see her be able to contribute as well . . . . In a nutshell maybe I shouldn't have said anything to you and maybe . . . just let my kid to learn to talk with you and address all of her concerns.

Yet his response did not bring the matter to a close. Williams believed that McElhaney violated team policy by texting Williams to complain about his daughter's removal from the starting lineup. Williams "especially" objected to McElhaney "injecting his daughter into th[e] equation." On those grounds, he forwarded the messages to Upperman Principal William Stepp.

Stepp found the text messages "inappropriate." So he took action: he banned McElhaney from a week's worth of softball games. In Stepp's mind, the suspension was warranted by McElhaney's violation of team rules, a violation that McElhaney made worse by putting L.M. into "the middle" of the matter. McElhaney challenged that decision to no avail. The school district officials that reviewed the matter informed McElhaney that they would not "overrule" Stepp's decision.

McElhaney did not honor the suspension. He attended L.M.'s next game. By all accounts, McElhaney did so without disrupting the game. Yet when Stepp spotted McElhaney in the stands, he asked him to leave. A School Resource Officer warned McElhaney that failing to do so would render him a trespasser. Fearing arrest, McElhaney left the field.

He was not content, however, to let things be. Invoking 42 U.S.C. § 1983, McElhaney filed a civil rights action against Williams, Stepp, various school athletic administrators, and the School Resource Officer. McElhaney asserted that his communications with Williams constituted protected speech under the First Amendment and that the school officials had impermissibly retaliated against him for exercising those speech rights. Further, he added, defendants did not afford him due process before infringing on his property right to his season tickets.

The officers moved for summary judgment, asserting that they were entitled to qualified immunity for their actions. The district court agreed. Applying *Lowery v. Euverard*, 497 F.3d 584, 589 (6th Cir. 2007), the district court held that the "right to attend games after [McElhaney] criticized the coach" was not clearly established, meaning defendants' purportedly retaliatory acts did not violate McElhaney's settled constitutional rights. The district court likewise concluded that McElhaney did not experience a due process violation because any alleged injury

he suffered could be remedied through a breach of contract action. Accordingly, the court entered judgment in favor of defendants. This timely appeal followed.

## II.

McElhaney challenges the district court's entry of summary judgment to defendants on both his First Amendment and due process claims. We review the district court's determination de novo. *El-Khalil v. Oakwood Healthcare, Inc.*, 23 F.4th 633, 634 (6th Cir. 2022) (summary judgment); *Peterson v. Heymes*, 931 F.3d 546, 553 (6th Cir. 2019) (qualified immunity). By rule, we must affirm the district court's summary judgment decision if "there [wa]s no genuine dispute as to any material fact" and defendants were "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A. *First Amendment Retaliation.* McElhaney leads off with his First Amendment retaliation claim. To prevail on that claim, he must show that: (1) he engaged in constitutionally protected speech, (2) the officers took adverse actions against McElhaney that caused him to suffer an injury that would likely chill a person of ordinary firmness from continuing that activity, and (3) the officers' actions were motivated, at least in part, by the exercise of his constitutional rights. *Myers v. City of Centerville*, 41 F.4th 746, 759 (6th Cir. 2022).

Because today's appeal arises from the successful assertion of qualified immunity, we must modify our inquiry. Qualified immunity shields officials from trial "unless their actions violate clearly established rights." *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 608 (6th Cir. 2015) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Overcoming the invocation of qualified immunity requires McElhaney to turn a double play of sorts. He must show both that (1) school officials violated his constitutional rights, and (2) that "the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). As McElhaney must touch both bases, a court need resolve only one of the two inquiries in defendants' favor to grant judgment to defendants. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

That is the tack the district court took in addressing only the second prong. As it rightly recognized, clearly established law "should not be defined at a high level of generality." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quotation marks omitted). What does that mean in effect? On the one hand, we do not require an earlier decision that is "directly on point." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). But on the other, "existing precedent" must place the contours of the right "beyond debate." *Id.* The constitutional right at issue here is the right not to be subjected to retaliation for engaging in First Amendment activity. In this appeal, the parties have focused their disagreement on the protected nature of McElhaney's speech, so we turn to that question now.

"[T]he First Amendment bars retaliation for protected speech," which is what McElhaney alleges occurred here. *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998); *accord Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994). That being the case, we ask whether any reasonable official would have understood that McElhaney's speech was protected, and thus that the official could not retaliate against him. *See Crawford-El*, 523 U.S. at 593; *see also Bloch v. Ribar*, 156 F.3d 673, 682 (6th Cir. 1998) ("The unlawful intent inherent in such a retaliatory action places it beyond the scope of a[n] . . . officer's qualified immunity if the right retaliated against was clearly established." (citation omitted)). We believe any reasonable officer would have understood that McElhaney's speech was protected.

Start with the settled understanding of the First Amendment. "[T]he bedrock principle underlying" the Amendment's free speech guarantee "is that states cannot prohibit speech merely because it offends the sensibilities of others." *Higgins v. Ky. Sports Radio, LLC*, 951 F.3d 728, 734 (6th Cir. 2020) (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989)). It follows that, "other than 'in a few limited areas,'" "almost all speech is protected" from governmental interference. *Novak v. City of Parma*, 932 F.3d 421, 427 (6th Cir. 2019) (quoting *United States v. Stevens*, 559 U.S. 460, 468 (2010)). Especially so, it bears adding, when government censorship is based on the views expressed within the speech. *See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393–94 (1993).

"[T]he right to criticize public officials" is safely within that protected speech zone. *Jenkins v. Rock Hill Loc. Sch. Dist.*, 513 F.3d 580, 588 (6th Cir. 2008). Discourse of that nature is typically off limits from government regulation. *Id. Jenkins* exemplifies the point. There, we held that a parent's complaints to a school administrator and subsequent letter to a newspaper were protected speech for First Amendment purposes. *Id.* at 583–85, 588; *see also Wenk v. O'Reilly*, 783 F.3d 585, 599 (6th Cir. 2015) (applying *Jenkins* to reject qualified immunity in a First Amendment retaliation case involving a parent's criticism of a teacher relating to the treatment of that parent's child).

True, there are a handful of categories of speech for which content-based prohibitions may be permissible. But it is a short and somewhat notorious list. It includes "speech expressed as part of a crime, obscene expression, incitement, and fraud." *Novak*, 932 F.3d at 427 (citing *United States v. Alvarez*, 567 U.S. 709, 717, 720 (2012)). Unless the nature of their speech falls within one of those "historic and traditional" categories, *Alvarez*, 567 U.S. at 717, schools cannot regulate the content of parents' speech about their child to a school employee who interacts with the child. *See Jenkins*, 513 F.3d at 588; *Wenk*, 783 F.3d at 599. That is precisely the nature of the clearly established right at issue here.

Defendants see things differently. By and large, however, their arguments speak to the constitutional violation prong—specifically, whether defendants' conduct in fact violated the First Amendment—a question the district court is best equipped to answer on remand. To the extent defendants' arguments touch upon the clearly established inquiry, they do not change our conclusion. For example, defendants believe that the First Amendment allows them to place "substance restrictions" on parental speech to school officials, including a prohibition against "directly debating with [a] coach about playing time." As a matter of decorum, that rule might well make good sense. But for better or worse, the First Amendment protects many statements and actions that arguably lack decorum. *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 448 (2011) (holding that the Westboro Baptist Church's protest of military funerals with signs that display "Thank God for IEDs" and "Thank God for Dead Soldiers" is protected speech).

For the most part, defendants' understanding of the First Amendment rests on student-speaker precedents, which allow for some institutional restraint on speech. In that context, school officials' "special interest" in avoiding disruption of educational programs justifies regulating student speech. *Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 141 S. Ct. 2038, 2044–45 (2021) (discussing *Tinker v. Des Moines Indep. Cmty. Sch. Dist*., 393 U.S. 503, 508 (1969)). As an example, consider *Lowery*. There, students protested against their high school football coach, at which point the school kicked the students off the team. 497 F.3d at 585–87. We held that the students did not have a valid First Amendment claim because the coach legitimately feared that the speech would disrupt the team's educational goals. *Id.* at 600–01. In reaching these conclusions, we emphasized the need to "balance . . . a student athlete's First Amendment rights and a coach's need to maintain order and discipline." *Id.* at 587, 589, 596–97. That framework, however, does not guide our consideration of parental speech about educational institutions. *See Jenkins*, 513 F.3d at 588 (assessing parental speech about a student child's education without looking to *Tinker*); *see also id.* ("Speech is generally protected by the First Amendment, with restrictions on only limited types of speech, such as obscenity, defamation, and fighting words[.]" (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 382–83 (1992))); *cf. Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986) (recognizing that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings").

When it comes to students, "courts must apply the First Amendment 'in light of the special characteristics of the school environment.'" *Mahanoy*, 141 S. Ct. 2038, 2044 (2021) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988)). In that setting, the school is standing in the place of the students' parents, assuming their role to preserve the educational experience. *Id.* at 244–45 (citing *Fraser*, 478 U.S. at 684). Parents, however, have a different relationship to school activities than do students. After all, the school is not acting as a parent's temporary guardian when the parent attends his or her child's extracurricular activity or a parent-teacher conference. As a result, the "disruption" standard applicable to student speech has not been applied to run-of-the-mill adult speech targeting school officials. *See, e.g.*, *Jenkins*, 513 F.3d at 588.

Defendants offer no compelling reason why this case should be treated differently.  The lone adult speech case defendants point to is *Blasi v. Pen Argyl Area School District*, 512 F. App'x 173 (3d Cir. 2013) (table) (per curiam).  There, the Third Circuit upheld a ban on a parent's attendance at his child's high school basketball game after the parent sent 17 racially charged emails to the coach.  *Id.* At 174.  To the extent that those emails were deemed to be "threatening," *see id.*, the First Amendment would not protect the parent's speech because "true threats" are not protected speech.  *Virginia v. Black*, 538 U.S. 343, 351 (2003).  Separately, the Third Circuit cited *Lowery* for the general proposition that student athletes enjoy limited First Amendment rights.  *Blasi*, 512 F. App'x at 175.  But, again, because *Lowery* dealt only with student athlete speech, 497 F.3d at 600–01, it is a poor guide for cases involving adult speech in the context of student athletics.

Lastly, defendants emphasize that McElhaney violated the rules in the "Parent – player Information" sheet distributed at the start of the season.  McElhaney, we note, balks at the idea that he agreed to be bound by the information sheet.  The form, to his mind, "reads as parental advice rather than a team 'rule' or 'policy.'"  Nor, he adds, does anything there make a parent's attendance contingent on a subjective determination of whether the parent's speech is "supportive," unlike the specific punishments tied to student behavior.

However one resolves these dueling interpretations, those conclusions do not bear upon McElhaney's clearly established rights as a parent speaker.  *See Jenkins*, 513 F.3d at 588.  Rather, they speak largely to whether defendants had a retaliatory motive when they suspended McElhaney—which, if so, would be at odds with the First Amendment.  That is not to say that school officials are entirely hamstrung in dealing with a parent like McElhaney.  For example, it does not appear as though Williams was required to respond to the texts criticizing his coaching decisions.  *See L. F. v. Lake Wash. Sch. Dist. #414*, 947 F.3d 621, 626–27 (9th Cir. 2020).  Likewise, as McElhaney himself acknowledges, a school may impose reasonable, viewpoint neutral, time, place, and manner restrictions on parental interactions with the school.  Here, the Upperman softball team rules already contained several such restrictions, including a ban on interactions between parents and players during games (a time restriction) and a prohibition on

parents attending practice (a place restriction).  But retaliating against speech on the basis of its content, as alleged here, drifts into foul territory.

*        *        *

In this day and age, one need not look (or scroll) far to find speech she deems disrespectful.  Many of us might share her sentiment.  But that does not mean the disrespectful speech opens one up to government retaliation.  The First Amendment muscularly protects most types of speech.  For today's purposes, it is enough to say that those protections encompass a parent's criticism of the ways in which school employees treat the parent's child at school. *See Jenkins*, 513 F.3d at 588.  In that situation, it is clearly established at a low level of generality that a school official may not retaliate against the parent for the content of his speech. *See id.*

Accordingly, McElhaney has satisfied the clearly established prong of the qualified immunity inquiry.  That leaves the threshold question of whether a constitutional violation in fact occurred, a determination best made by the district court on remand. *Cf. Novak*, 932 F.3d at 430 (remanding a First Amendment retaliation qualified immunity claim).  Back in the district court, the evidence might show that none (or only some) of defendants' actions were motivated by McElhaney's speech, rather than the time, place, or manner of that speech.  Or it might show that the ban was not a sufficiently adverse action. *Rudd v. City of Norton Shores*, 977 F.3d 503, 514–15 (6th Cir. 2020) (collecting cases on instances of "adverse action").  Either way, these questions are best answered by the district court in the first instance.

B. *Due Process.*   McElhaney also contends that his due process rights were violated because he was deprived of his contractual right to sit in his reserved game seats without sufficient process.  His claim has a fundamental flaw:  it is a state law claim, not a federal one. Whatever property rights McElhaney maintained in his season tickets, those rights were subject to school and team rules, meaning school officials conceivably could suspend McElhaney from sitting there due to a rules violation.  Whether McElhaney's tickets were so conditioned, however, is a state contract law question. *Ramsey v. Bd. of Educ. of Whitley Cnty.*, 844 F.2d 1268, 1273 (6th Cir. 1988).  That fact is dispositive here because there is no due process

violation for a deprivation that can be completely remediated under state contract law. *Id.* McElhaney's recourse, in other words, is a suit for breach of contract, not a § 1983 action. *Id.*

On this point, it bears reminding that although McElhaney asserted in his complaint a state contract claim against the Putnam School Board, the district court declined to exercise supplemental jurisdiction over the claim. McElhaney may still have a viable breach of contract claim, but that is not for us to say. All we need conclude is that McElhaney did not appeal the declination of supplemental jurisdiction, meaning the issue is not part of this appeal.

\*   \*   \*   \*   \*

We reverse in part, affirm in part, and remand the matter for proceedings in accordance with this opinion.