NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0179n.06

No. 20-1285

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Apr 08, 2021
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| ERIC OSTERGREN, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| HEATHER FRICK, *et al.*, | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE: SILER, WHITE, and STRANCH, Circuit Judges.

HELENE N. WHITE, Circuit Judge. Plaintiff Eric Ostergren, a property owner in Gerrish Township, Michigan, appeals the dismissal of his First Amendment and Fourteenth Amendment claims against Defendants Heather Frick, the Michigan State Tax Commission's former Executive Director, and David Buick, the current Executive Director. We affirm.

### I. Factual Background

Eric Ostergren owns property and a second home in Gerrish Township, Michigan. Ostergren heard that a local tax assessor was improperly assessing local properties. He publicly raised the issue but alleges that he was "often times ignored because he personally was not a licensed assessor." R. 37 PID 283. To bolster his credibility, he decided to get his tax-assessor license and become a Michigan Certified Assessing Officer ("MCAO").

The Michigan Tax Commission is responsible for educating and certifying all tax assessors in the state.[1] Tax assessors are public officials who work for cities, townships, and counties; their main duty is to assess the values of land and properties for state taxing purposes. To become a tax assessor, one must obtain the MCAO designation from the Tax Commission. Prospective tax assessors seeking an MCAO designation must take a course (the "MCAO Program") and pass a final examination. The course is available in classroom and self-study format; Ostergren chose the latter.

For the self-study version of the course, applicants are emailed course material relating to nine tax-assessment topics, which they may study at their own pace, culminating in a four-hour exam. To access the course materials and participate in the self-study program, prospective assessors must pay a $250 fee and fill out an application that—at the time Ostergren signed up— included a non-disclosure agreement (NDA).[2]

The NDA required applicants to acknowledge that course materials were confidential and promise not to publicly disclose those materials. It also stated that violations may result in the revocation of an assessor's MCAO certification:

---

[1] *See* MICH. COMP. LAWS ANN. § 211.10d(1) ("The annual assessment of property shall be made by an assessor who has been certified as qualified by the state tax commission as having successfully completed training in a school of assessment practices or by the passage of a test approved by the state tax commission and conducted by the state tax commission or an agency approved by the state tax commission that will enable the individual to properly discharge the functions of the office. The school shall be established by an approved educational institution in conjunction with the state tax commission and be supervised by the state tax commission and its agents and employees."); *id.* at § 211.10d(10) ("The state tax commission shall promulgate rules for the issuance or revocation of certification.").

[2] The $250 fee consists of a $200 fee for the course materials and a $50 fee for exam administration. The classroom version of the course—which features hybrid online and in-person class sessions over a six-month period— costs $1,000. According to Ostergren's complaint, both versions of the course required execution of the NDA.

> The State Tax Commission's Michigan Certified Assessing Officer (MCAO) Self-Study Program Material and Comprehensive Examination (the "Exam"), including the content and wording of the text and written exam questions, constitute State Tax Commission confidential information and is protected by intellectual property laws. MCAO Self-Study program candidates receiving course material and/or completing an Exam must agree to the Non-Disclosure Agreement (NDA), which obligates them to maintain the confidentiality of the course material and Exam.
>
> This Non-Disclosure Agreement (NDA) is made and entered into by and between the State Tax Commission, ("STC") and you (the "Candidate"). The course material and Exam are made available to the Candidate solely for the purpose of demonstrating competency in the content area referenced within the Exam. This policy is enforced to ensure the integrity of the course material, Exam and the MCAO Program.
>
> 1. **Confidential Information.** The content of the course material and Exam, including without limitation, questions, answers, or any communication, including oral communication, regarding or related to the Exam is STC confidential information ("Confidential Information"). Any disclosure of Confidential Information is a violation of this NDA and could compromise the integrity and security of the MCAO Certification Program. The Candidate is expressly prohibited from disclosing, publishing, reproducing, copying, selling, posting, downloading or transmitting any Confidential Information, in whole or in part, in any form or by any means, oral or written, electronic or mechanical, for any purpose.
>
> 2. **Certification Revocation.** The Candidate acknowledges and agrees his/her assessing certification may be jeopardized and/or revoked by the STC if this NDA is violated in any manner.
>
> By signing below, the Candidate acknowledges the full right and authority to enter into this NDA and accepts and agrees to be bound by the terms and conditions as outlined within the NDA. This NDA is effective as of the date below and remains in effect indefinitely.

R. 37-4 PID 302. Ostergren signed the NDA, took the course, passed the exam, and received his tax-assessor license.

Ostergren never sought employment as a tax assessor, but he resumed his public criticism of local tax assessors. Once more, however, he claims his "concerns were flatly ignored." R. 37 PID 286. So Ostergren published portions of the MCAO course material in a social media post, to show his online followers how local tax assessors were improperly re-assessing properties. He

sent an email along the same lines to several Gerrish Township officials, attaching portions of the course materials.

On January 15, 2019, Defendant Heather Frick—then the Executive Director of the Tax Commission—sent Ostergren a letter stating that the Tax Commission's disciplinary committee would be holding an "informal hearing" to address his potential violation of the NDA and determine whether action against his assessor license was warranted. R. 37 PID 287. On February 21, Ostergren attended the hearing with his lawyer. He filed this lawsuit three days later, before the Commission took any action. He sued Frick in her personal and official capacities, alleging that the NDA was an unlawful prior restraint and imposed an unconstitutional condition.[3]

After the lawsuit was filed, the disciplinary committee recommended not taking any disciplinary action against Ostergren's license. In an April 8, 2019 public meeting, the Tax Commission unanimously adopted the recommendation. In that meeting, the Tax Commission also asked the state Attorney General's office to "review and advise on" the NDA. R. 37-7 PID 320. In a public meeting two months later, on June 11, the Tax Commission voted "to discontinue the use of the current Non-Disclosure Agreement and no longer enforce the current Non-Disclosure Agreement against those who already signed it." R. 37-10 PID 349.

In his complaint, Ostergren states that he is "now unsure whether and to what respect the [Tax Commission] will seek again or further discipline for [Ostergren's] desired action of continued and further sharing, discussing, and/or publicly speaking about the content of the course materials." R. 37 PID 289. Although Ostergren received a letter informing him that no discipline

---

[3] Frick left her post as Executive Director while this case was pending. When she did, Ostergren amended his complaint, and now brings the same claims against Frick in her personal capacity (requesting money damages) and David Buick—the current Executive Director—in Buick's official capacity (requesting injunctive relief).

would be imposed for his original NDA violation, he says that the Tax Commission can begin "at any time" to enforce the NDA once again. *Id.* at PID 290.

## II. Procedural History

Ostergren's operative complaint seeks a damage award against Frick in her personal capacity and injunctive relief against Buick in his official capacity. In a jointly filed motion to dismiss, Defendants argued that Ostergren's claims were moot and that he failed to allege any constitutional violation. Frick also argued that she is entitled to qualified immunity. The magistrate judge (MJ) granted the motion,[4] concluding that the NDA is not a prior restraint, and that because the unconstitutional-condition claim relied on the theory that the NDA is a prior restraint, that claim failed as well.

The MJ entered an order dismissing the case on March 30, 2020. Ostergren filed a notice of appeal the following day. Three weeks later, on April 24, 2020, Ostergren filed a Rule 59(e) motion, requesting that the MJ reopen the judgment and grant him leave to amend his complaint to allege a First Amendment retaliation claim. The MJ denied the motion. Ostergren never filed a notice of appeal from this order, but he challenges it on appeal.

## III. Discussion

We review de novo the MJ's grant of Defendants' motion to dismiss. *Johnson v. Morales*, 946 F.3d 911, 917 (6th Cir. 2020). We "'construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff.'" *Cahoo v. SAS Analytics, Inc.*, 912 F.3d 887, 897 (6th Cir. 2019) (quoting *Courtright v. City of Battle* Creek, 839 F.3d 513, 518 (6th Cir. 2016)). We may consider exhibits attached to the complaint if "'they are referred to in the complaint and

---

[4] The parties consented to have a magistrate judge conduct all proceedings, including entry of final judgment. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

are central to the claims contained therein.'" *Rondigo, L.L.C. v. Township of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011) (quoting *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)).

This appeal raises four issues. First, we must determine whether Ostergren's claim for injunctive relief is moot. We conclude it is not moot under the voluntary-cessation doctrine. Second and third, we must determine whether the NDA imposes either an unlawful prior restraint or an unconstitutional condition. It does not impose either.[5] Finally, Ostergren challenges the MJ's denial of his Rule 59 motion. But we lack jurisdiction to address that challenge because Ostergren never filed a notice of appeal from the denial of this motion.

## A. Mootness

In his claim against Buick, Ostergren requests an injunctive order declaring the NDA unconstitutional and barring the Tax Commission from enforcing it against Ostergren. Defendants argue that Ostergren's request for injunctive relief is moot, in light of the Tax Commission's decision to discontinue using and stop enforcing the NDA against those who signed it.

Article III's case-or-controversy requirement "mandates that a claim must not become moot prior to the court's decision on the merits." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019). A case is moot "'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Id.* (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). However, "as a general rule, 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case

---

[5] Frick invokes qualified immunity for both claims. To defeat qualified immunity, plaintiffs must demonstrate that (1) the defendant violated a constitutional right and (2) the right was clearly established. *Brown v. Lewis*, 779 F.3d 401, 411 (6th Cir. 2015). We "may address these prongs in any order, and if the plaintiff cannot make both showings, the [defendant] is entitled to qualified immunity." *Id.* at 412. Because Ostergren has not adequately alleged a constitutional violation, "we need not address the 'clearly established' prong" of the analysis. *Silberstein v. City of Dayton*, 440 F.3d 306, 320 (6th Cir. 2006).

moot.'" *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953))). Otherwise, "courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.'" *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982)).

The voluntary cessation standard "is stringent." *Id.* In general, we ask whether "'subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)). "The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Id.* (quoting *Concentrated Phosphate Exp. Ass'n*, 393 U.S. at 203)).

However, while the "bar is high" to show that voluntary cessation has mooted a claim, it is slightly lower "when it is the government that has voluntarily ceased its conduct." *Speech First*, 939 F.3d at 767; *see also id.* ("[C]essation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties. . . . [The government's] self-correction provides a secure foundation for a dismissal based on mootness so long as it appears genuine." (quoting *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 981 (6th Cir. 2012))). But "not all [governmental] action enjoys the same degree of solicitude[,]" and we consider "the totality of the circumstances surrounding the voluntary cessation, including the manner in which the cessation was executed." *Id.* at 768.

When the government passes new legislation or repeals old laws, that presumptively moots the case; but where a change is "merely regulatory, the degree of solicitude" turns on "whether the regulatory processes leading to the change involved legislative-like procedures or were ad hoc,

discretionary, and easily reversible actions." *Id*. "If the discretion to effect the change lies with one agency or individual, or there are no formal processes required to effect the change, significantly more than the bare solicitude itself is necessary to show that the voluntary cessation moots the claim." *Id.* But if the change occurs through "formal, legislative-like procedures," that may "moot the case" without the government "do[ing] much more than simply represent[ing] that it would not return to the challenged policies." *Id.* We also consider timing. A change enacted in response to litigation "raises suspicions" that it is not genuine and less likely to last. *Id.* at 769; *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998); *Northland Fam. Plan. Clinic, Inc. v. Cox*, 487 F.3d 323, 342-43 (6th Cir. 2007).

These considerations cut against finding mootness here. To start, the Tax Commission only made its change after Ostergren filed this lawsuit, and that timing undermines its mootness argument. Next, the Tax Commission has sole discretion over rules relating to tax-assessor licensing,[6] which also undercuts a finding of mootness. *See Akers v. McGinnis*, 352 F.3d 1030, 1035 (6th Cir. 2003) (rejecting argument that state correctional department mooted case by changing a challenged rule, reasoning that "the promulgation of work rules appears to be solely within the discretion of the MDOC, [so] there is no guarantee MDOC will not change back to its older, stricter Rule as soon as this action terminates").

Further, the process used to enact the change was not the type of formal, "legislative-like" procedure that warrants solicitude. The Tax Commission has the power to "promulgate rules for the issuance and revocation of [tax-assessor] certification." MICH. COMP. LAWS ANN. § 211.10d(10). Here, it simply voted in a public meeting to discontinue and stop enforcing the

---

[6] *See* MICH. COMP. LAWS ANN. § 211.10d(10) (providing Tax Commission with ability to "promulgate rules for the issuance or revocation of [tax-assessor] certification").

NDA. It appears that the Tax Commission could simply vote to reinstate the NDA—and begin enforcing it again—at a subsequent meeting.

In sum, because the Tax Commission made its change after litigation began, used an informal process, and seems able to easily reverse its decision through a vote at any public meeting, the change did not moot Ostergren's claim for injunctive relief.

## B. Prior-Restraint Claim

Ostergren claims that the NDA is a prior restraint that violates the First Amendment. A prior restraint is any law, administrative order, or judicial order that forbids protected speech in advance. *Schmitt v. LaRose*, 933 F.3d 628, 637-38 (6th Cir. 2019); *Novak v. City of Parma*, 932 F.3d 421, 432 (6th Cir. 2019). Because prior restraints create a risk of government censorship, they are presumptively unconstitutional. *McGlone v. Bell*, 681 F.3d 718, 733 (6th Cir. 2012).

Prior restraints can exist in many forms. Traditionally, courts have recognized two "classic" categories: judicial injunctions targeting future speech and licensing schemes that require a speaker to obtain approval from a state official before speaking. *Novak*, 932 F.3d at 433; *Schmitt*, 933 F.3d at 638.[7] But "the formality of these classic cases [is] a sufficient condition for a prior restraint, not a necessary one." *Novak*, 932 F.3d at 433. More informal actions by government officials may also constitute prior restraints, such as threats or informal directives that share the same functional characteristics of more traditional prior restraints. *See id.* at 432-33 (police threat to prosecute Facebook-page operator and letter demanding that Facebook shut down page); *Whitney v. City of Milan*, 677 F.3d 292, 295-99 (6th Cir. 2012) (public employer's informal order that employee refrain from speaking to terminated coworker). *But see Kesterson v. Kent State*

---

[7] *See also* 2 SMOLLA & NIMMER ON FREEDOM OF SPEECH § 15:1 (Oct. 2020 ed.) ("The traditional touchstones of a prior restraint are . . . that the government purports to require preclearance or operates with the direct force of a judicial order restraining speech prior to its expression." (emphasis omitted)).

*Univ.*, 967 F.3d 519, 524, 526 (6th Cir. 2020) (holding that college softball coach did not impose prior restraint by advising player not to tell anyone about a sexual assault because the "alleged restraint must impose a 'legal impediment'" and the coach "did nothing of the sort." (citation omitted)). For several reasons, we conclude that the NDA did not impose an unconstitutional prior restraint.

To start, the NDA does not fall within either "classic" category of prior restraints; nor does it share any of their typical characteristics. It does not create a licensing scheme and does not provide any avenue for a state official to review and approve prospective speech. It also does not operate with the same force as a judicial or administrative order forbidding speech ahead of time and does not provide any mechanism through which the state can seek an injunction. Notably, we do not face a prospective injunction seeking to prohibit Ostergren from sharing the course materials in the future. And the NDA does not bear resemblance to the informal threats we found actionable in *Novak* or *Whitney*. In short, the NDA lacks the normal qualities of a prior restraint.

The NDA is also unlike typical prior restraints in that it was entered voluntarily. Usually, prior restraints involve a unilateral command—either through an injunction, licensing-scheme rejection, or administrative order or threat—not to speak. But here, Ostergren voluntarily signed the NDA and agreed not to share course materials. We have not identified—nor have the parties identified—any cases holding that a non-disclosure agreement alone (as opposed to an injunction enforcing one) amounts to a prior restraint.[8]

---

[8] First Amendment challenges to non-disclosure agreements sit within the interstices of at least three legal principles: the rule against prior restraints, the rule that people can contractually waive constitutional rights, and the unconstitutional conditions doctrine. Several commentators have recognized the lack of clarity in this area. *See, e.g.*, 2 SMOLLA & NIMMER ON FREEDOM OF SPEECH § 15:59.50 (Oct. 2020 ed.) (noting that recent public "[c]ontroversies over non-disclosure agreements . . . have raised anew the question of the extent to which First Amendment doctrines are or are not implicated by private contractual arrangements that limit speech. . . . [I]t is not at all clear whether the First Amendment of its own force might ever limit the power of courts to enforce such agreements."); Brittany Scott, *Waiving Goodbye to First Amendment Protections: First Amendment Waiver by Contract*, 46 HASTINGS CONST. L.Q.

Several courts—including the Supreme Court and our Circuit—have rejected First Amendment challenges to non-disclosure agreements, all emphasizing that the challenging party voluntarily undertook a duty not to speak. *See Snepp v. United States*, 444 U.S. 507, 508-09 & n.3 (1980); *Cohen v. Cowles Media Co.*, 501 U.S. 663, 671 (1991); *Yoder v. Univ. of Louisville*, 526 F. App'x 537, 546-47 (6th Cir. 2013); *Henley v. Cuyahoga Cnty. Bd. of Mental Retardation and Dev. Disabilities*, 141 F. App'x 437, 445-46 (6th Cir. 2005); *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, 685 F. App'x 623, 626-27 (9th Cir. 2017);[9] *cf. United States v. Aguilar*, 515 U.S. 593, 606 (1995) ("As to one who voluntarily assume[s] a duty of confidentiality, governmental restrictions on disclosure are not subject to the same stringent standards that would apply to efforts to impose restrictions on unwilling members of the public."). Ostergren voluntarily assumed a contractual duty of confidentiality when he signed the NDA. In doing so, he acknowledged that the course materials were confidential and promised not to publicly share them.

Further, it was only by entering this contract that Ostergren obtained access to the course materials in the first place. Before entering the contract, he had no ability to engage in behavior the NDA prohibits; it was only by making a contractual promise to maintain confidentiality that

451, 452 (2019) ("First Amendment waiver . . . does not have a robust history. While the Supreme Court has stated that . . . First Amendment rights are waivable, any jurisprudence has remained lacking. First Amendment waiver by contract exists in a gap between the Supreme Court's prior restraint doctrine, which prohibits judicial suppression of speech prior to its occurrence, and the unconstitutional conditions doctrine, which prohibits the government from conditioning benefits on an agreement to waive a constitutional right."); Alan E. Garfield, *Promises of Silence: Contract Law and Freedom of Speech*, 83 CORNELL L. REV. 261, 263 n.4 (1998) ("The literature is particularly sparse on the public policy implications of contracts of silence."); *id.* at 347 ("Whether state enforcement of contracts of silence implicates the First Amendment . . . is not entirely clear.").

[9] In 2019, the Fourth Circuit allowed a First Amendment challenge to proceed against the enforcement of a non-disparagement clause in a settlement agreement between a plaintiff and the police department she was suing for police brutality. *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 219-26 (4th Cir. 2019). The Fourth Circuit found that the clause was best treated as a waiver of First Amendment rights—and did not apply a prior-restraint analysis—but ultimately concluded that First Amendment-related public policy interests rendered the waiver unenforceable because it directly involved police brutality and aimed at silencing "government-critical speech." *Id.* at 222, 224. But the panel implied that its conclusion might have been different if the waiver involved a "private speaker['s] . . . unauthorized disclosure of confidential or sensitive information that was held by the government and to which the speaker would not have had access but for a promise of confidentiality or other fiduciary obligation to the government." *Id.* at 224 n.9. As noted below, we are presented with that kind of case here.

he was able to access the materials. *See Nat'l Abortion Fed'n*, 685 F. App'x at 626-27 (rejecting First Amendment challenge to injunction enforcing non-disclosure agreement, noting that "one may not obtain information through fraud, promise to keep that information confidential, and then breach that promise in the name of the public interest"); *cf. Overbey*, 930 F.3d at 224 n.9.

***

For the reasons above, we conclude that the NDA did not impose an unlawful prior restraint in violation of the First Amendment.[10]

### C. Unconstitutional-Conditions Claim

Ostergren next alleges that the NDA violated the unconstitutional-conditions doctrine. He argues that the state required prospective tax assessors to relinquish their First Amendment rights as a condition of obtaining the government benefit of a tax-assessor license.

The unconstitutional-conditions doctrine stems from the principle that although government may "grant [a privilege] upon such conditions as it sees fit to impose," that power "is not unlimited; and one of the limitations is that it may not impose conditions which require the

---

[10] To be clear, we do not hold that a government *never* imposes a prior restraint when it chooses to operate through contracts, as opposed to through regulations, rules, or court orders. The First Amendment does not contain an exception for government contracts. *See United States v. Marchetti*, 466 F.2d 1309, 1313 (4th Cir. 1972) ("[T]he First Amendment limits the extent to which the United States, contractually or otherwise, may impose secrecy requirements upon its employees and enforce them with a system of prior censorship."); Daniel J. Solove & Neil M. Richards, *Rethinking Free Speech and Civil Liability*, 109 COLUM. L. REV. 1650, 1668-69 (2009) ("If First Amendment law is centrally concerned with state censorship, it is important to note that sometimes the state can censor just as effectively through legal forms that are private as it can through ones that are public."); *id.* (noting that although courts frequently apply First Amendment limitations to state tort actions but not contract actions, "[a] state could also use contract law to achieve similar goals [to those achieved with libel laws]."). A blanket rule that confidentiality agreements can never be prior restraints would be inconsistent with our recent recognition that the prior-restraint doctrine should be applied functionally and should not be limited to a narrow list of formal actions. *See Novak*, 932 F.3d at 433 ("A government official should not have to declare his order official or jump through certain procedural hoops to create a prior restraint. Such a rule would allow government officials to cloak unconstitutional restraints on speech under the cover of informality.").

Rather, our determination is limited to the specific circumstances and considerations that this case presents. For example, it may be possible for a government to create a de facto licensing scheme by imposing—through contract—a more pervasive structure of pre-speech review than we have here, which may implicate different concerns and require a different analysis. *Cf. Snepp*, 444 U.S. at 507-08 (describing CIA's contractual pre-publication review system). Likewise, if the government sought an injunction forbidding NDA-violative speech ahead of time, that also may implicate different concerns.

relinquishment of constitutional rights." *Frost v. R.R. Comm'n*, 271 U.S. 583, 593-94 (1926). Accordingly, "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons," the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Thus, the state usually may not condition a benefit on a recipient's waiver of constitutional rights. *See R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434 (6th Cir. 2005) ("Under the unconstitutional conditions doctrine, 'a state actor cannot constitutionally condition the receipt of a benefit . . . on an agreement to refrain from exercising one's constitutional rights.'" (citation omitted)).

But this principle is not absolute. In assessing a challenged condition, it is relevant to ask whether the condition directly relates to the benefit offered or instead "reaches beyond" that benefit to regulate unrelated constitutional rights. The Supreme Court has most explicitly articulated this principle in government-spending cases. In *Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205, 213, 221 (2013) ("*AOSI*"), the Court applied this principle to invalidate a policy conditioning the grant of public-health funds on recipients "explicitly agree[ing] with the Government's policy to oppose prostitution and sex trafficking." The Court emphasized that the "relevant distinction" is between "conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage speech outside the contours of the program itself." *Id.* at 214-15. The challenged policy "reach[ed] outside" the federal program and thus fell "on the unconstitutional side of the line." *Id.* at 217.[11]

---

[11] In *Dolan v. Tigard*, 512 U.S. 374, 385 (1994), a case involving the Takings Clause, the Supreme Court also emphasized the relevance of the relationship between the condition imposed and the benefit being offered. *See id.* ("Under the well-settled doctrine of 'unconstitutional conditions,' the government may not require a person to give

In a recent decision, *Daunt v. Benson*, we invoked *AOSI*'s principle outside the government-spending context. 956 F.3d 396, 412-13 (6th Cir. 2020). There, we addressed an unconstitutional-conditions challenge to a state law restricting membership on an independent redistricting commission based on current or past political ties. *Id.* at 401. We noted that the condition "d[id] not represent some out-of-place addition to an unrelated state program" but was "part and parcel of the definition of this Commission, of how it achieves [partisan] independence[.]" *Id*. at 412. Citing *AOSI*, we reasoned that this direct relationship was "critical to the constitutionality of a challenged program under the unconstitutional-conditions doctrine, as the Supreme Court's government-funding cases make clear." *See id.* at 412-13 (noting that the government may not impose a condition that "cannot be confined within the scope of the Government program," but adding that the challenged "limit[ation]" of constitutional rights was "[f]ar from . . . [an] extraneous condition[]").[12]

---

up a constitutional right—here the right to receive just compensation when property is taken for a public use—in exchange for a discretionary benefit conferred by the government *where the benefit sought has little or no relationship to the property*." (emphasis added) (citations omitted)).

[12] The Third Circuit recently suggested that the *AOSI* principle would be relevant in assessing an unconstitutional-conditions challenge similar to Ostergren's. *B.L. ex rel. Levy v. Mahanoy Area Sch. Dist.*, 964 F.3d 170 (3d Cir. 2020), *cert. granted sub nom. Mahanoy Area Sch. Dist. v. B.L.*, --- S. Ct. ----, No. 20-255, 2021 WL 77251 (Jan. 8, 2021). In *B.L.*, a high-school student used profanity in a social-media post to criticize the cheerleading team after she was not chosen for the varsity squad. *Id.* at 175. When the student signed up for the team, she acknowledged a set of rules requiring cheerleaders to have respect for the team, avoid using foul language, and refrain from posting negative information about the team. *Id*. at 176. The student was removed from the team for her post and alleged that the removal violated her First Amendment rights. *Id.* The defendants argued that the student waived those rights by agreeing to the team rules; she responded that if so, the rules amounted to an unconstitutional condition. *Id.* at 192.

The Third Circuit avoided the issue by finding that no waiver occurred but noted that the *AOSI* principle— whether the rules imposed a condition related to the benefit offered—would have been relevant: "[F]or the government to condition participation in a beneficial program on a waiver of First Amendment rights raises serious constitutional concerns, particularly where the government 'seek[s] to leverage [benefits] to regulate speech outside the contours of the program itself.'" *Id.* (quoting *AOSI*, 570 U.S. at 214-15)). "At the same time, however, the line between constitutional and unconstitutional conditions is 'hardly clear,' and there are a wide range of extracurricular activities and student roles that may make conditions on such speech more or less connected to the needs of the program." *Id.* (quoting *AOSI*, 570 U.S. at 215).

The challenged condition here (a promise not to share course materials) is directly related to the benefit offered. The NDA's challenged condition is limited in scope and focus. It does not limit expression unrelated to the course—or even related to the course; it simply prevents applicants from sharing course materials. The course materials surely cost money and time to develop, and the state charges applicants $200 to access them (or $1,000 to access the in-person classroom version of the course). The restriction on publishing course materials operates "within the scope of the [MCAO] program" and in no way regulates speech "outside the contours" of that program. *AOSI*, 570 U.S. at 215. Accordingly, Ostergren fails to allege an unconstitutional condition.

### D. Ostergren's Rule 59 Motion

Finally, Ostergren challenges the MJ's denial of his Rule 59(e) motion to reopen judgment and amend his complaint to allege a First Amendment retaliation claim. But because Ostergren failed to file a notice of appeal relating to this denial, we lack appellate jurisdiction to address this challenge.

On March 30, 2020, the MJ granted Defendants' motion to dismiss and entered an order dismissing the case. Ostergren filed a notice of appeal the next day. Three weeks later, he filed a Rule 59(e) motion, requesting leave to amend his complaint and allege a First Amendment retaliation claim. The MJ denied the motion, and Ostergren never filed a notice of appeal relating to that denial. Because he failed to do so, the MJ's denial of the Rule 59 motion is not properly before us. *See United States v. Univ. Mgmt. Servs., Inc., Corp.*, 191 F.3d 750, 756-57 (6th Cir. 1999) ("Because the notice of appeal references only the district court's summary judgment rulings, we do not have jurisdiction to consider issues raised in the Motion for Reconsideration."); *Masco Cabinetry Middlefield, LLC v. Cefla N. Am. Inc.*, 637 F. App'x 192, 201 (6th Cir. 2015)

("We note first that Masco's challenge to the denial of relief from judgment is not properly before us. Masco filed its notice of appeal challenging the summary judgment ruling before the Rule 60(b)(1) ruling was made and never filed an amended notice of appeal specifically challenging the latter ruling." (citing Fed. R. App. P. 4(a)(4))).

Federal Rule of Appellate Procedure 4(a)(4)(B)(ii) provides that "[a] party intending to challenge an order disposing of" several enumerated motions, including Rule 59 motions, "must file a notice of appeal, or an amended notice of appeal—in compliance with Rule 3(c)—within the time prescribed by this Rule measured from entry of the order disposing of the last such remaining motion[]" in the list. Rule 3(c) requires a notice of appeal to "designate the judgment, order, or part thereof being appealed." Fed. R. App. P. 3(c)(1)(B).

Although Rule 3(c)(1)'s notice requirements are jurisdictional, we "liberally construe[] and appl[y]" them. *Caudill v. Hollan*, 431 F.3d 900, 907 (6th Cir. 2005). In situations like this one—where a party files a notice of appeal from a final judgment, then files a post-judgment motion, but never files a notice of appeal from the post-judgment ruling—the key question is whether the issue in the post-judgment motion was raised prior to the final judgment. An appeal from a final judgment "'draws into question all prior non-final rulings and orders.'" *Nat'l Ecological Found. v. Alexander*, 496 F.3d 466, 476-77 (6th Cir. 2007) (quoting *Caudill*, 431 F.3d at 905)). Thus, "[t]o the extent that . . . post-judgment motions relate to issues raised before judgment, the appellate court will deal with them." *Caudill*, 431 F.3d at 906. We "will not, however, absent specific mention in the notice of appeal, entertain issues raised" for the first time in "post-judgment motions if the notice of appeal states only that the appeal is from the final order or the final judgment." *Id.*

In other words, the key question is whether the issue in the Rule 59 motion was raised prior to the final judgment. If so, the "judgment" referenced in Ostergren's notice of appeal suffices to

preserve the issue for appeal. *See Dice Corp. v. Bold Techs.*, 556 F. App'x 378, 383 (6th Cir. 2014) ("[If] 'the post-judgment motions relate to issues raised before judgment, the appellate court will deal with them anyway.'. . . The only concern . . . is compliance with [Rule 3(c)'s] notice requirement. . . . What matters is that the issues flagged in the notice of appeal have already been raised." (quoting *Caudill*, 431 F.3d at 906)). The "dividing line is the last appealed judgment: issues raised before the last appealed judgment will be considered, issues raised after will not." *Id.*

Here, the last appealed judgment was the MJ's March 30 order granting the motion to dismiss. Prior to this order, Ostergren never raised the issues he discussed in his Rule 59 motion. He never asked for leave to amend to allege a retaliation claim and—as the MJ noted—never put the parties on notice that he intended to allege First Amendment retaliation. *See* R. 51 PID 565 (noting that Ostergren did not "allege a retaliation claim, nor did he give the Court any notice in his brief in response to Defendants' motion to dismiss that he intended a retaliation claim in his operative pleading"). Ostergren never mentioned First Amendment retaliation in any of the filings he submitted prior to the MJ's final judgment. Accordingly, his March 31 notice of appeal did not suffice to preserve the retaliation issue. We therefore dismiss this aspect of Ostergren's appeal for lack of appellate jurisdiction.

## IV. Conclusion

For the foregoing reasons, we affirm the MJ's order granting Defendants' motion to dismiss, and we dismiss Ostergren's Rule 59 challenge for lack of jurisdiction.